IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | No. 33774-0-III |
| | ) | |
| K.S.F.[†] | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

LAWRENCE-BERREY, A.C.J. — Kevin F. appeals from the trial court's order

terminating his parental rights to his son, K.S.F. He argues the trial court erred in finding

that all necessary services had been offered or provided because the Department of Social

and Health Services (DSHS) failed to provide bonding and attachment therapy. Mr. F.

also argues that because DSHS did not offer proper services, the trial court prematurely

found that he was unfit, that little likelihood existed that conditions would be remedied so

K.S.F. could be returned to him in the near future, and that termination was in K.S.F.'s

best interests. We affirm the termination order.

---

[†] To protect the minor's identity, we use initials for the child's name, and an initial
for the father's last name.

FACTS

Mr. F. is the father of K.S.F., who was born in August 2007.[1] Mr. F. has cerebral palsy. Throughout 2007 and 2008, DSHS received multiple referrals questioning Mr. F.'s ability to care for K.S.F. The referrals alleged Mr. F. had asked the referent to feed, bathe, and change K.S.F. In May 2008, DSHS received a referral alleging that K.S.F. was crawling around on the floor with dog and cat urine and also had not eaten in 24 hours, except for some applesauce.

In light of these referrals, DSHS provided family preservation services (FPS). The FPS provider determined Mr. F. and the mother were not capable of parenting and that K.S.F. was unsafe in the home. DSHS then filed a dependency petition and placed K.S.F. in foster care.

Following a contested fact finding hearing, the trial court found K.S.F. dependent. DSHS recommended the following services for Mr. F.: parenting education, a nursing child assessment satellite training (NCAST) assessment, applying for therapy and assistance equipment with a disability aid agency, participating in an occupational physical capacity evaluation, meeting with Developmental Disabilities Administration caseworkers and complying with their recommendations, and participating in individual counseling with a parenting component. DSHS also requested a psychological

---

[1] K.S.F.'s mother is M.C. The trial court terminated M.C.'s parental rights before the trial in this case, and M.C. is not a party to this appeal.

2

evaluation. DSHS determined these were the appropriate services to address Mr. F.'s identified parental deficiencies. The trial court ordered Mr. F. to complete these services.

In October 2008, Dr. Roland Dougherty, a clinical psychologist, performed a psychological evaluation on Mr. F. DSHS also referred Mr. F. and K.S.F. for a bonding and attachment assessment with Jennifer Obeid-Campbell, a bonding and attachment therapist. DSHS also contacted Nancy Riggle, a parenting instructor, to review Mr. F.'s and K.S.F.'s files and recommend other supports and services.

At subsequent review hearings, the trial court also ordered Mr. F. to: (1) comply with all bonding and attachment recommendations, (2) participate in parenting coaching with Michelle Leifheit, (3) meet with DSHS caseworkers and other care providers to discuss accommodations that would assist him in caring for K.S.F., (4) participate in videotaped intensive interactive parenting, and (5) complete an updated parenting education program addressing K.S.F.'s developmental needs. Mr. F. also participated in nine months of parenting instruction with Aracelia Sanchez.

The dependency lasted six years. At review hearings, the trial court consistently found that Mr. F. was in partial compliance with the court's prior orders but had not made progress toward correcting the problems that necessitated K.S.F.'s placement in foster care. Mr. F. participated in services and occasionally made some progress, but was generally unsuccessful in improving his parental deficiencies. Although Mr. F. said he understood the service providers' instructions, he was unable to demonstrate those parenting skills or put what he had learned into practice. He did not complete his

parenting education assignments consistently, did not utilize the recommended adaptive equipment, and failed to eliminate safety hazards in his apartment. He refused individual counseling throughout the dependency because he did not believe he needed it. For the last year of the dependency, Mr. F. stopped engaging in services altogether.

DSHS filed the termination petition in December 2013. The termination trial began July 30, 2014. At trial, DSHS called the four social workers who had worked on the case—Cloreese Wilkinson-Rivera, Timothy Barbour, Brenna Blanscett, and Kathy Lund. DSHS also called Ms. Leifheit, Deborah Cox (a physical therapist), Rachel Ockleston-Catt (an occupational therapist), Dr. Dougherty, Ms. Obeid-Campbell, Ms. Riggle, Ms. Sanchez, and both guardian ad litems (GALs) who had worked on the case— Tara Symons and John Fredrick.

Ms. Sanchez testified that she saw some bonding between Mr. F. and K.S.F., but that their bond was just building. She testified this was one of the reasons she recommended increasing the length of visitations. She also testified that, to her knowledge, there were no other services Mr. F. needed that DSHS had not offered or provided.

Ms. Leifheit testified that Mr. F. was not emotionally responsive to K.S.F., and that the two lacked a connection. She stated Mr. F. had a flat affect with K.S.F., had difficulty communicating with him, and was awkward with him. She also testified DSHS "made reasonable efforts in their referrals and services that they provided to Mr. [F.]." Report of Proceedings (RP) at 123.

4

Dr. Dougherty testified that he administered the Millon Clinical Multiaxial Inventory (MCMI-3), which is a standardized test designed to detect personality disorders. Dr. Dougherty testified Mr. F.'s scores on this test suggested the possible presence of a narcissistic personality disorder with negativistic, paranoid, and depressive features, which are difficult to treat. He testified he was reluctant to simply diagnose a personality disorder because Mr. F. has cerebral palsy, which entails various emotional, psychological, and social challenges. However, he believed these traits affected Mr. F.'s functioning and should be considered in treatment.

Pertaining to treatment, Dr. Dougherty recommended that Mr. F. engage in psychotherapy/counseling. He noted that Mr. F. was raised in an orphanage and had early problems with bonding and attachment. Dr. Dougherty believed Mr. F.'s relationship problems with K.S.F.'s mother and Mr. F.'s attachment problems with K.S.F. were related to his own bonding and attachment problems, and that counseling could address these. Dr. Dougherty believed counseling could address Mr. F.'s negative personality characteristics and provide extra support in reuniting him with K.S.F. Dr. Dougherty also recommended continued parenting training for Mr. F. When asked if there were other services that could be offered to Mr. F., Dr. Dougherty testified that support groups may be helpful, although he questioned whether Mr. F. would use them effectively.

Finally, DSHS asked Dr. Dougherty what effect it has on a child to be in long-term foster care without being physically and legally identified in a permanent home. Dr.

5

Dougherty responded that it is best for children to be in stable relationships with parents they feel bonded and attached to, and children are more likely to become securely bonded the sooner they have a permanent home.

Ms. Obeid-Campbell described the results of the bonding and attachment assessment. Ms. Obeid-Campbell testified that K.S.F.'s attachment to Mr. F. was "non-indicative of a secure attachment." RP at 203. She testified that the parenting dynamic was very unstructured, but that this was more illustrative of Mr. F.'s deficits than K.S.F.'s attachment to Mr. F. Ms. Obeid-Campbell believed it would be very difficult for Mr. F. to foster K.S.F.'s secure attachment development, as he did not provide K.S.F. with the necessary consistency, structure, and follow-through. Ms. Obeid-Campbell also noted Mr. F. had good empathy and nurturing ability.

Mr. Barbour testified that DSHS individualized this case and assessed Mr. F.'s specific needs. He testified he reviewed the reports and assessments from Mr. F.'s various providers and relied on this information in formulating his opinions and recommendations. Mr. Barbour reviewed Ms. Obeid-Campbell's bonding assessment and determined that Mr. F. had real strengths, such as his ability to empathize and nurture, but he also had limitations, which included providing structure, organizing, and preparing to carry out parenting tasks. Mr. Barbour's main impression from the bonding assessment was a concern about Mr. F.'s general lack of parenting skills.

Mr. Barbour described Mr. F. and K.S.F.'s relationship as generally positive, but indifferent. He did not believe there was a strong attachment between Mr. F. and K.S.F. and believed that K.S.F. needed this.

Ms. Blanscett testified that she reviewed all of the assessments, reports, and evaluations from all the various providers and took these into account when making her recommendations. She stated the services DSHS offered would have assisted in correcting Mr. F.'s parental deficiencies if he would have participated or demonstrated progress. She further testified that there were no other services that would have helped during the period of time she had the case.

DSHS asked Ms. Riggle for her opinion on the services DSHS had offered or provided and whether she had any further recommendations. Ms. Riggle testified that "[t]he services that had been provided were excellent." RP at 289. She later added that Mr. F. could have benefitted from supported living services or a residential program, but aside from these, she did not believe DSHS could have offered or provided any other services that would have helped Mr. F. parent K.S.F.

Ms. Symons, who was the assigned GAL from 2008 to 2014, testified that

[t]here has certainly been attachment issues the entire time and that was very evident since [K.S.F.] was a toddler. He was very resistant to his dad. That bond and attachment was clearly not there.

. . . .
. . . The bond just wasn't really there and that was always a concern to me for [K.S.F.].

7

RP at 309. Ms. Symons testified that a child with a secure attachment to a caregiver depends on that caregiver to meet his or her needs, and she never saw K.S.F. go to Mr. F. when he needed something. She testified that K.S.F. "was aggressive with his dad. He would run away. He would push him away. He wouldn't go to him for any kind of comfort." RP at 315. When asked if the services DSHS offered or provided were the appropriate services to address Mr. F.'s parental deficiencies, Ms. Symons agreed that they were.

Mr. Fredrick, who was the assigned GAL from January 2014 until the termination trial, testified there was no parental bond between Mr. F. and K.S.F. He stated the two did not connect, talk to each other, or look at each other. Instead, K.S.F. would ignore Mr. F. He also testified, based on his review of all the records and the documents in the case, the services DSHS provided were the appropriate services to correct Mr. F.'s parental deficiencies.

Ms. Lund, the last social worker on the case, also testified that the services the court ordered were those necessary to correct Mr. F.'s deficiencies.

Following presentation of the evidence and closing arguments, the trial court granted DSHS's petition to terminate Mr. F.'s parental rights to K.S.F. In ordering termination, the trial court found DSHS had established each of the six elements contained in RCW 13.34.180(1) by clear, cogent, and convincing evidence. The trial court found that DSHS had offered or provided Mr. F. all necessary services, reasonably available, capable of correcting his parental deficiencies within the foreseeable future.

The trial court also found that there was little likelihood that conditions could be remedied so K.S.F. could be returned to Mr. F. in the near future. In making this finding, the trial court found that there was not a secure bond or attachment between Mr. F. and K.S.F., and that a secure bond would be very difficult for them to develop. The trial court also found that Mr. F. was unfit to parent, and that termination of Mr. F.'s parental rights was in K.S.F.'s best interests.

Mr. F. appeals.

## ANALYSIS

Parents have fundamental liberty and privacy interests in the care and custody of their children. *In re Welfare of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011). Thus, a court may terminate parental rights "'only for the most powerful [of] reasons.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington courts use a two-step process when deciding whether to terminate parental rights. *Id.* First, DSHS must show that the statutory requirements in RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. *S.J.*, 162 Wn. App. at 880. Second, DSHS must show that termination is in the best interests of the child by a preponderance of the evidence. *Id.* Only if the first step is satisfied may the court reach the second step. *Id.*

Under the first element, the statutory requirements that DSHS must allege and prove by clear, cogent, and convincing evidence are outlined in RCW 13.34.180(1):

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

Mr. F. challenges the trial court's finding regarding subsection (d) and argues the trial court's finding regarding subsection (e) was premature. This court's review is limited to determining if substantial evidence supports the trial court's findings of fact. *S.J.*, 162 Wn. App.at 881. "Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the declared premise." *Id.* Because the trial court has the opportunity to hear the testimony and observe the witnesses, its factual findings are entitled to great deference. *Id.* This court does not make credibility determinations or weigh evidence on review. *Id.*

A.    NECESSARY SERVICES

Mr. F. argues that substantial evidence does not support the trial court's finding that DSHS offered or provided all necessary services. Specifically, Mr. F. argues that

10

DSHS failed to offer bonding and attachment therapy. He argues that Dr. Dougherty recommended this service, and also cites testimony from the social workers, various providers, and GALs describing how he and K.S.F. lacked a secure attachment.

To satisfy its statutory burden under RCW 13.34.180(1)(d), DSHS is required to offer or provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." When a condition prevents a parent and child from reunifying, DSHS must provide any necessary services to address that condition, regardless of whether it can be labeled a "parental deficiency." *In re Parental Rights to K.M.M.*, __ Wn.2d __, 379 P.3d 75, 83 (2016). Thus, a service is "necessary" within the meaning of the statute if it is needed to address a condition that precludes reunification of the parent and child. *Id.* DSHS must also tailor the services it offers to meet each individual parent's needs. *S.J.*, 162 Wn. App. at 881.

Mr. F. relies on *S.J..* In *S.J.*, the mother rectified the unsanitary living conditions and substance abuse issues that led to the dependency, and she and the child then began participating in therapeutic visitation. *Id.* at 876-77. During visits, the child became increasingly resistant, controlling, and aggressive toward the mother. *Id.* at 877. The mother "faithfully kept the scheduled visitations and had applied parenting suggestions" but met increasing resistance from the child. *Id.* The mother suspected her child had detached from her, so she requested attachment therapy from her FPS therapist. *Id.* The social worker identified bonding and attachment as a major issue between the mother and child. *Id.* at 878. However, he did not refer them for bonding and attachment therapy

11

because he incorrectly believed they were already getting similar services from the parent educator, the mother did not complain about those services, and he did not want to burden the mother with additional services. *Id.* The trial court terminated the mother's parental rights, finding that despite her engagement in services she nevertheless failed to repair her relationship with the child. *Id.* at 879.

The *S.J.* court reversed, holding that DSHS had not provided all necessary services. *Id.* at 884. The court reasoned that DSHS had identified attachment and bonding as a "major issue," but then failed to provide attachment and bonding services. *Id.* at 883. The *S.J.* court further reasoned that the mother applied the suggested parenting skills and that it was DSHS's responsibility to try to reduce the child's controlling and aggressive behavior related to his detachment—not the mother's responsibility. *Id.*

Another instructive case is *In re Parental Rights to K.J.B.*, 188 Wn. App. 263, 354 P.3d 879 (2015), *review granted*, 184 Wn.2d 1033, 366 P.3d 932 (2016). In that case, the trial court found the child dependent and then ordered the father to complete drug and alcohol evaluation and treatment, urinalysis testing, and parenting assessment and instruction. *Id.* at 267. The father never remedied his substance abuse issues, and the trial court terminated his parental rights. *Id.* at 267, 272.

On appeal, the father, relying on *S.J.*, argued that counseling and a mental health assessment were necessary services for correcting his identified parenting deficiency of substance abuse, and DSHS should have therefore offered them. *Id.* at 279. This court

distinguished *S.J.*, reasoning that the trial court never ordered a mental health assessment or mental health counseling, and none of the social workers involved in the case testified that the father had a mental health issue that required evaluation or services. *Id.* at 280.

In this case, the trial court found that Mr. F. and K.S.F. did not have a strong bond or attachment. The parties do not dispute this finding. Thus, in determining whether bonding and attachment therapy was a necessary service under RCW 13.34.180(1)(d), the central question is whether this lack of bonding and attachment prevented Mr. F. and K.S.F. from reunifying. If it did, it was a necessary service.

There was no evidence at trial that bonding and attachment therapy was needed to address any condition that precluded Mr. F. and K.S.F. from reunifying. This case is therefore unlike *S.J.* because in that case the mother had remedied her other parental deficiencies and the main condition preventing her and the child from reunifying was her inability to rectify her relationship with the child. *S.J.*, 162 Wn. App. at 878. In contrast, the conditions here that precluded Mr. F. and K.S.F. from reunifying were Mr. F.'s "failure to participate in recommended services, failure to demonstrate progress in improving his parental deficiencies, and failure to make progress over the substantial period of time of the dependency." Clerk's Papers (CP) at 105. Mr. F.'s deficiencies included his "lack of parenting skills, mental health issues, and lack of motivation to change." CP at 108. The implication is that if these deficiencies were corrected, Mr. F. and K.S.F. would be able to bond and attach.

This case is more like *K.J.B.*, where the father argued on appeal that DSHS failed

to provide counseling and a mental health assessment, but none of the social workers

testified that the father actually needed those services. While it is true that Mr. F. and

K.S.F. did not have a strong bond or attachment, the record does not support Mr. F.'s

suggestion that this prevented the two from reunifying.[2] Accordingly, bonding and

attachment therapy was not a necessary service.

Contrary to Mr. F.'s argument, substantial evidence supports the trial court's

finding that DSHS offered or provided all necessary services. Mr. Barbour and Ms.

Blanscett both reviewed the assessments, reports, and evaluations from all the various

providers and relied on this information in formulating their opinions and

recommendations. Ms. Symons, Mr. Fredrick, and Ms. Lund all testified the services the

court ordered and DSHS provided were the appropriate services to correct Mr. F.'s

parental deficiencies. Ms. Sanchez, Ms. Blanscett, and Ms. Riggle all testified there were

no other services Mr. F. needed that DSHS had not offered or provided.[3]

---

[2] Our Supreme Court has recently issued decisions addressing the necessity of bonding and attachment services under RCW 13.34.180(1)(d). *See, e.g., K.M.M.*, 379 P.3d at 85-86 (affirming the termination order because bonding and attachment services would have been futile); *In re Parental Rights to B.P.*, 186 Wn.2d 292, 376 P.3d 350, 365 (2016) (reversing the termination order because DSHS failed to offer or provide bonding or attachment services). These decisions are not applicable here, where there was no evidence that the lack of bonding and attachment was a condition preventing reunification.

[3] Mr. F. asserts that "Dr. Dougherty recommended services to address attachment issues" between Mr. F. and K.S.F. Br. of Appellant at 31. The service Dr. Dougherty recommended was psychotherapy/counseling. Dr. Dougherty believed Mr. F. had bonding and attachment issues stemming from his childhood and believed counseling

Substantial evidence supports the trial court's finding that DSHS offered or provided all necessary, reasonably available services, and therefore proved RCW 13.34.180(1)(d) by clear, cogent, and convincing evidence.

B.    UNFITNESS, LITTLE LIKELIHOOD FOR REMEDYING PARENTAL DEFICIENCIES IN THE NEAR FUTURE, AND BEST INTERESTS

Mr. F. finally argues that because DSHS did not offer or provide bonding and attachment therapy, the trial court prematurely found (1) he was unfit to parent, (2) there was little likelihood his parental deficiencies would be remedied so K.S.F. could be returned to him in the near future, and (3) termination was in K.S.F.'s best interests.

However, because we conclude that DSHS did in fact offer or provide all necessary services, these three findings were not premature. Because Mr. F. does not argue that these findings are unsupported by substantial evidence, but rather hinges his argument on the assumption that he did not receive all necessary services, we need not analyze each finding individually.

C.    AXIS II "DIAGNOSIS"

Mr. F. assigns error to the following finding of fact:

---

could address these. Dr. Dougherty also recommended continued parenting training and suggested a support group, but never mentioned bonding and attachment therapy.

> The father was diagnosed in a psychological evaluation with Axis II personality characteristics of narcissistic, negativistic, paranoid, and depressive traits, which were born out by the father's actions and behaviors throughout the dependency. These traits are difficult to treat and require the motivation to change, which the father failed to show.

CP at 106 (Finding of Fact 1.11(4)(q)). Mr. F. does not address this assignment of error in the substantive portion of his brief. An appellant ordinarily waives an assignment of error when he or she presents no argument in support of the assigned error. *See In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243-44, 237 P.3d 944 (2010). But we exercise our discretion to address this finding so it does not have consequences beyond this appeal.

Mr. F. is correct that substantial evidence does not support the finding that he was *diagnosed* with these personality traits. Rather, Dr. Dougherty stated that Mr. F.'s scores on the MCMI-3 "suggested the possible presence" of a personality disorder, but that he was "reluctant to simply diagnose a personality disorder" due to Mr. F.'s cerebral palsy. RP at 154, 159.

But this factual finding is irrelevant for purposes of the termination order. The fact that Mr. F. was not diagnosed with these personality traits does not impact the trial court's ultimate finding that DSHS proved RCW 13.34.180(1)(d) by clear, cogent, and convincing evidence.

No. 33774-0-III
*Parental Rights to K.S.F.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Korsmo, J.

Siddoway, J.

17